Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, California 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Attorneys for Plaintiff
*Nicholas A. Vena*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS A. VENA, | Case No.: 3:22-cv-00437-W-BLM |
| Plaintiff, | **PLAINTIFF'S NOTICE OF APPEAL FROM FINAL JUDGMENT** |
| v. | Judge: Thomas J. Whelan |
| MOORE, SCHULMAN & MOORE, APC; JULIE WESTERMAN, ESQ.; DAVID SCHULMAN, ESQ., and DOES 1 through 100, inclusive, | Courtroom: 3c |
| Defendants. | |

NOTICE OF APPEAL FROM FINAL JUDGMENT

Notice is hereby given that Plaintiff Nicholas A. Vena hereby appeals to the United States Court of Appeals for the Ninth Circuit from the district court's order granting the defendants' motion for summary judgment and the subsequent judgment (entered on the district court docket as entry numbers 110 and 111 on December 20, 2024). A copy of said order and judgment, and a representation statement, are attached.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: January 13, 2025        By: _____
                                   Charles S. LiMandri, Esq.
                                   Paul M. Jonna, Esq.
                                   Jeffrey M. Trissell, Esq.
                                   Attorneys for Plaintiff Nicholas A. Vena

2

**ATTACHMENT**



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nicholas A. Vena | Civil Action No.  22-cv-00437-W-BLM |
| **Plaintiff,** | |
| **V.** | |
| See Attached | **JUDGMENT IN A CIVIL CASE** |
| **Defendant.** | |

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

The Court DENIES Plaintiff's motion for summary adjudication [Doc. 83] and GRANTS Defendants' summary-judgment motion [Doc. 86].

**Date:**  _____12/20/24_____

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By:  s/ L. Sotelo _____
L. Sotelo, Deputy

# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

(ATTACHMENT)

**Civil Action No.** 22-cv-00437-W-BLM

Defendants:

Moore, Schulman & Moore, APC;

Julie Westerman Esq.;

Does 1 through 100;

Esq. David Schulman;

Jeannie Lowe;

JAMS, Inc. Mediation Services

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS A VENA,<br><br>                                     Plaintiff,<br><br>v.<br><br>MOORE, SCHULMAN & MOORE,<br>APC, et al.<br><br>                                     Defendants. | Case No.:   3:22-cv-0437-W-BLM<br><br>**ORDER DENYING PLAINTIFF'S SUMMARY JUDGMENT MOTION [DOC. 83] AND GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION [DOC. 86]** |

Pending before the Court are the parties' cross-motions for summary judgment/adjudication. The Court decides the matters on the papers submitted and without oral argument. Civ. L.R. 7.1(d.1). For the reasons that follow, the Court **DENIES** Plaintiff's motion for summary adjudication [Doc. 83] and **GRANTS** Defendants' motion for summary judgment [Doc. 86].

//

//

//

1

## I.    BACKGROUND

This lawsuit arises out of an underlying state court marital-dissolution proceeding between Plaintiff Nicholas A. Vena and Christine Vena before a privately compensated temporary judge, Commissioner Jeannie Lowe (Ret.). During the child-custody trial, attorneys from the law firm representing Christine, Defendant Moore, Schulman & Moore, appeared in mediations before Commissioner Lowe and neither the Commissioner nor Defendants disclosed those appearances to Nicholas.

At the conclusion of the Vena trial, Commissioner Lowe entered orders for financial support and child custody that Nicholas believed were unjust. He then requested and obtained new disclosures for Commissioner Lowe, which revealed the other cases she mediated with MSM attorneys. Nicholas successfully moved to disqualify Commissioner Lowe and her orders were vacated. The subsequent orders entered by the superior court required Nicholas to pay more in child and spousal support, and reduced his parenting time with most of his children.

Meanwhile, Nicholas filed this lawsuit against MSM and the firm's attorneys who represented Christine in the Vena matter. Nicholas asserts causes of action for violation of his due-process rights under 42 U.S.C. § 1983, negligence, wrongful conduct, and intentional interference with contract. (*See FAC* [Doc. 40].) The parties have now filed cross motion for summary judgment/adjudication.

### A.    The marital dissolution proceeding.

On November 18, 2019, Christine filed a petition for legal separation against Nicholas in the San Diego Superior Court, North County Family Division. (*FAC* [Doc. 40] at ¶ 10.) Christine was represented by Defendant Julie Westerman, a partner at MSM. (*Id.*) "In addition to legal separation, the case involved substantial contested issues, including child custody and visitation; child support; spousal support; property characterization; valuation, and division; and attorney's fees and costs." (*Id.*)

3:22-cv-0437-W-BLM

On December 5, 2019, Judge James Mangione entered a stipulation and order giving Christine primary physical custody of the children. (*Defs' NOL* [Doc. 86-6], Ex. 1.) The order provided Nicholas with parenting time with the five older children on alternate weekends and every Tuesday after school until Wednesday morning. (*Id.*) It also provided him parenting time with the younger twin boys, for three hours every Tuesday and Thursday and for seven hours on alternating Saturdays. (*Id.*)

On January 28, 2020, Nicholas moved ex parte for an emergency change to the custody orders, seeking more parenting time. (*Defs' NOL*, Ex. 2.) Judge Wood denied the request. (*Id.*)

On March 13, 2020, Judge Wood entered interim custody and visitation orders. (*Defs' NOL*, Ex. 3; *Westerman Decl.* [Doc. 86-3] at ¶ 3.) The orders provided Nicholas time with the four middle children every Tuesday after school to Wednesday morning, alternating weekends, and alternating Mondays; with the oldest child at her discretion; and with the twins for three hours Tuesdays and Thursdays and seven hours on alternating Saturdays. (*Id.*)

On August 17, 2020, Nicholas again applied ex parte for a change to the custody and visitation orders, which Judge Wood denied. (*Defs' NOL*, Ex. 4.)

In August 2020, Westerman reduced her workload on the Vena matter in preparation for maternity leave. (*Westerman Decl.* at ¶ 4.) MSM attorney Amy Feldmann became more involved in the case. (*Id.*) At some point, MSM attorney David Schulman also became involved in the case. (*Schulman Decl.* [Doc. 86-4] at ¶ 3.) Westerman began maternity leave in late August. (*Westerman Decl.* at ¶5.)

### B.    The parties decide to engage a private judge.

The Covid-19 pandemic delayed the child-custody trial. As a result, the parties discussed retaining a private judge.

On August 13, 2020, Nicholas' attorney, Tara Yelman and Feldman exchanged emails about engaging a private judge. (*Defs' NOL*, Ex. 5.) During the exchange, Yelman

3

acknowledged there were only about four private judges with enough experience to preside over the matter, including Commissioner Lowe:

> The pool is finite, unless there was someone else you were thinking of, there are only about four Judges there with a lot of family law experience Howatt Lowe Denton Goldsmith. Then you have Murphy and Lewis who don't have as much but are experienced in family law. [¶] Have her look them up and tell me which 2 or 3 she is comfortable with[.]

(*Defs' NOL*, Ex. 5 at 25 of 434.[1])

On August 18, 2020, Feldmann sent Yelman a letter stating that Christine was willing to use either Commissioner Lowe or Judge Joan Lewis (Ret.). (*Defs' NOL*, Ex. 7.) On September 1, Yelman emailed Feldman to confirm that "[y]our client agreed to go forward and as discussed we chose one of the two she offered." (*Defs' NOL*, Ex. 8 at 37 of 434.) A few minutes later, Feldman responded: "Correct – I think we are all in agreement on utilizing Comm. Lowe." (*Id.* at 36 of 434.)

On October 6, 2020, the Stipulation and Order for Appointment of Privately Compensated Temporary Judge (the "Stipulation") was filed. (*Pl's Exhibits* [Doc. 83-5], Ex. 4 at 82 of 568.) The Stipulation includes Commissioner Lowe's signature for the Oath of Office. (*Id.* at 84 of 568.) The last sentence of the Oath certified that she is aware and will comply "with the applicable provision of Canon 6 of the Code of Judicial Ethics and the California Rules of Court." (*Id.*) The Stipulation also provided that either party had the right to petition to terminate without cause or file a motion to withdraw the Stipulation for good cause. (*Id.* at 88 of 568.)

### C.    **Commissioner Lowe's disclosures before the Vena matter began.**

On September 18, 2020, Commissioner Lowe signed the Disclosure Checklist. (*Pl's Exhibits*, Ex. 3 at 44–48 of 568.) The document disclosed that within the past 24

---

[1] Page references for the parties' exhibits are to the CM/ECF file stamp at the top of the page.

3:22-cv-0437-W-BLM

months Commissioner Lowe had a "significant professional relationship with a party, attorney, or law firm in the instant case. . . ." (*Id.* at 44 of 568.) Nicholas understood that Commissioner Lowe was referring to her "significant professional relationship" with MSM, and not his attorneys. (*Defs' NOL*, Ex. 14 at 94 of 434.) The Disclosure Checklist also stated that Commissioner Lowe will,

> entertain offers of employment or new professional relationships in any capacity other than as a lawyer, expert witness, or consultant from a party, lawyer in the hearing, or lawyer or law firm that is currently associated in the private practice of law with a lawyer in the hearing while the hearing is pending, including offers to serve as a dispute resolution neutral in another case[.]

(*Pl's Exhibit*, Ex. 3 at 46 of 568.) Immediately below this disclosure, the document also stated:

> **The Master will not inform the parties if he or she subsequently receives an offer or new matter while the matter was pending.**

(*Id.*, emphasis in original.) Nicholas admitted he saw these disclosures and nevertheless consented to Commissioner Lowe's appointment. (*Defs' NOL*, Ex. 14 at 95 of 434.)

### D. The Vena custody trial.

The custody trial began in March 2021 and lasted 15 days over the course of approximately three months. (*See Jt. Statement* [Doc. 91] at ¶ 19.) During the trial, there was unfavorable testimony regarding Nicholas' anger issues. For example, Christine testified that when Nicholas was angry, he would take nursing babies away from her and leave. (*Defs' NOL*, Ex. 25 at 176 of 434.) During one argument, Christine testified that she went into a bathroom and locked the door to get away from Nicholas. (*Id.* at 177 of 434.) He punched a hole in the bathroom door. (*Id.*) Christine also testified that Nicholas would hit and kick the family dogs in front of the children, and once kicked a dog so hard that he broke its leg. (*Id.* at 178 of 434.)

3:22-cv-0437-W-BLM

In addition to Christine's testimony, the children's nanny testified that Nicholas almost never spent time with the children, did not help homeschool them and never changed diapers. (*Defs' NOL*, Ex. 27 at 184–186 of 434.) While she characterized Christine as a "wonderful" mother, she stated Nicholas was an "absent" father. (*Id.* at 187 of 434.) A family friend testified that Nicholas made "concerning" statements about hitting one of his children while wearing rings, causing the child to bleed, and hurting the family dog. (*Defs' NOL*, Ex. 28 at 191–192 of 434.) And a therapist testified that she stopped the girls' therapy because of the pushback she received from Nicholas and his attorney Yelman. (*Defs' NOL*, Ex. 29 at 202 of 434.)

On June 21, 2021, Commissioner Lowe issued an oral decision regarding child custody that was consistent with Judge Mangione's and Judge Woods' earlier orders. Commissioner Lowe gave Christine primary physical custody over all the minor children. (*Defs' NOL*, Ex. 30 at 224 of 434.) She granted Nicholas parenting time overnights on alternate weekends and overnights Tuesday afternoon until Wednesday morning for the four middle children. (*Id.* at 224–225 of 434.) Regarding the twins, Nicholas had parenting time overnight on Tuesdays, six hours on Thursdays, and from noon Saturday until noon Sunday on alternate weekends. (*Id.* at 225–226 of 434.)

On July 27, 2021, Commissioner Lowe issued an order setting child support and temporary spousal support at the guideline amounts. (*Defs' NOL*, Ex. 32 at 271–272 of 434.) For the period January through June 2021, child support for the six children was set at $3,528 per month and temporary spousal support at $993 for a total of $4,521 per month. (*Id.*) Commencing on July 1, 2021, child support increased to $3,775 per month and temporary spousal support increased to $1,055 for a total of $4830 per month. (*Defs' NOL*, Ex. 32 at 272 of 343; *Westerman Decl.* at ¶ 19.) These amounts reflected Commissioner Lowe's agreement with Nicholas' request to consider the fact that he was paying $5,000 per month in rent while Christine's housing costs totaled $1,325 per month. (*Defs' NOL*, Ex. 32 at 271 of 343.) Commissioner Lowe also set arrears retroactively at $24,943 for the period January 1 to July 31, 2021. (*Id.* at 272 of 343.)

6

3:22-cv-0437-W-BLM

Finally, on September 22, 2021, Commissioner Lowe granted Christine's ex parte application to place the proceeds from the sale of P2P Holdco, Inc. stock/units to be held in trust by MSM. (*Westerman Decl.* at ¶ 20; *Defs' NOL*, Ex. 33 at 279 of 343.)

**E.   During the Vena trial, MSM retained Commissioner Lowe as a mediator in other matters.**

Two days after the trial began, David Schulman appeared at a mediation in front of Commissioner Lowe in another case. (*Jt. Statement* at No. 25.) Schulman's undisputed testimony is that his opposing counsel, Dan Herbert—who also represented Nicholas from October 2021 until about July 2022 (*Yelman Decl.* [Doc. 103-3] at ¶ 2)—proposed Commissioner Lowe. (*Schulman Decl.* at ¶ 6.) Schulman also appeared before Commissioner Lowe in mediations on other cases on May 3 and May 19, 2021. (*Jt. Statement* at No. 24.) Schulman's undisputed testimony is that in both cases, counsel for the opposing side proposed Commissioner Lowe. (*Schulman Decl.* ¶¶ 7, 8.)

In addition to Schulman, two other MSM attorneys appeared in mediations with Commissioner Lowe during the Vena trial. (*Jt. Statement* at Nos. 24, 26.) Attorney Erik Moore appeared in three mediations and attorney Sara Bear in one. (*Id.*) Neither Moore nor Bear were involved in the Vena matter. (*Westerman Decl.* at ¶¶ 21, 22.)

None of the matters in which MSM attorneys appeared before Commissioner Lowe during the Vena trial were disclosed to Nicholas.

**F.   After the custody trial, Nicholas demands updated disclosures.**

On September 2, 2021, Yelman requested updated disclosures from Commissioner Lowe. (*Defs' NOL*, Ex. 35.) The updated disclosures identified eight previously undisclosed mediations that MSM attorneys had with Commissioner Lowe. (*Pl's Exhibits*, Ex. 23 at 184 of 568.)

On September 22, 2021, Nicholas moved to disqualify Commissioner Lowe based on (1) his inability to continue paying for the private judging and (2) for cause due to the

3:22-cv-0437-W-BLM

perception that Commissioner Lowe was not impartial. (*Defs' NOL*, Ex. 38 at p. 310 of 434.) With respect to the "for cause" ground, Nicholas' argument was based on *Jolie v. Superior Court of Los Angeles County*, 66 Cal.App.5th 1025 (2021), which was decided after the Vena trial concluded. (*Id.* at p. 312–314 of 434.) Additionally, in citing Commissioner Lowe's failure to disclose the new matters as the basis for disqualification, Nicholas contended that he "never agreed to waive his right to disclosures under the Code of Judicial Ethics canon 6. . . ." (*Id.* at 311 of 434.) There is no dispute that Nicholas and his counsel were aware of Commissioner Lowe's disclosure on September 18, 2020 that she would not disclose any subsequent engagements. (*Pl's Exhibit*, Ex. 3 at 46 of 568; *Defs' NOL*, Ex. 14 at 95 of 434.)

On September 28, 2021, Commissioner Lowe filed a verified answer asserting she was not biased against Nicholas but agreeing to the recusal. (*Defs' NOL*, Ex. 40.)

### G.    Nicholas fared worse in the proceedings in Superior Court.

On April 15, 2022, Judge Victor M. Torres voided Commissioner Lowe's orders. (*Pl's Exhibits*, Ex. 28.) Meanwhile, Judge William Wood began issuing new orders that, when compared to Commissioner Lowe's orders, were substantially the same or worse for Nicholas.

On November 9, 2021, consistent with Commissioner Lowe's order, Judge Wood ordered that all funds received from the sale of P2P Holdco be placed into a trust account held by MSM. (*Westerman Decl.* at ¶ 27; *Defs' NOL*, Ex. 41 at 372 of 434.) The order provided for "no exceptions for Nicholas Vena to directly receive funds from or related to P2P Holdco, Inc. . . ." (*Id.*)

Regarding child and temporary spousal support, after hearing evidence, Judge Torres issued an order significantly increasing the support Nicholas owed, both presently and in arrears. (*Defs' NOL*, Ex. 42.) Judge Torres' order incorporated other business proceeds and imputed those as income to Nicholas, which Commissioner Lowe declined to do. (*Defs' NOL*, Ex. 42 at 378–379 of 434.) Judge Torres found Nicholas' average

monthly income for 2021 was $345,838, more than 25 times Commissioner Lowe's finding of $13,666. (*Compare Defs' NOL*, Ex. 42 at 379 of 434 *with Defs' NOL*, Ex. 32.) He also found Nicholas' arrears totaled $266,018—more than ten times what Commissioner Lowe had found. (*Defs' NOL*, Ex. 42 at 383 of 434.)

Regarding custody and visitation, Judge Torres gave Nicholas legal and physical custody of the oldest child and gave Christine legal and physical custody of the other four minor children. (*Westerman Decl.* at ¶ 29; *Defs' NOL*, Ex. 43 at 391–392 of 434.) Regarding parenting time, for the four minor children residing with Christine, Judge Torres gave Nicholas four hours on Friday afternoons, seven hours on Sundays, and two hours on Mondays, with no overnight stays. (*Defs' NOL*, Ex. 43 at 392 of 434.) This was significantly less time than Judge Wood ordered in his temporary custody orders (*see Defs' NOL*, Ex. 3), and significantly less time than Commissioner Lowe ordered (*see Defs' NOL*, Ex. 30 at 224–226 of 434).

**H.    Nicholas files this lawsuit and JAMS reimburses his fees.**

On April 1, 2022, Nicholas filed this lawsuit alleging the four causes of action against Defendants MSM and Westerman. (*See Compl.* [Doc. 1].) On March 7, 2023, Nicholas filed the First Amended Complaint adding Schulman as a defendant. (*See FAC*.) Meanwhile, on September 14, 2022, JAMS refunded Nicholas the $63,400 he paid in fees to have Commissioner Lowe privately judge the matter. (*Defs' NOL*, Ex. 44.)

**II.    SUMMARY-JUDGMENT STANDARD**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if

3:22-cv-0437-W-BLM

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing

3:22-cv-0437-W-BLM

of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.    PLAINTIFF'S OBJECTIONS

Nicholas raises a number of objections to certain paragraphs in the declarations of Westerman, Schulman and Defendants' expert, Edward McIntyre [Doc. 90-5]. The Court will only consider objections to portions of the declarations relied upon in this order. All other objections are **OVERRULED** as **MOOT**.

Nicholas objects to the entirety of Westerman's declaration to extent it is based on information and belief. (*Pl's Am. Objections* [Doc. 103-1] at No. 1.) The statements cited in this order from Westerman's declaration are based on her personal involvement in the Vena case. The objections are **OVERRULED**.

Nicholas also objects to paragraph 3 in Schulman's declaration on the ground that it is based on information and belief. (*Pl's Am. Obj.* at No. 2.) The only fact relevant from paragraph 3 for this order is that it shows Schulman was involved in the Vena case. Any objection to that fact is **OVERRULED**. Nicholas also objects to paragraphs 6, 7 and 8 on the ground that he does not identify the basis for his knowledge. (*Pl's Am. Obj.* at No. 2.) It is undisputed that Schulman was involved in the mediations, which is the basis for his knowledge. (*Jt. Statement* Nos. 24, 26.) The objections are **OVERRULED**.

Finally, Nicholas objects to paragraph 27 of Edward J. McIntyre's declaration on the ground that it is based on facts that Defendants asserted are privileged and they refused to produce or disclose and for "which Mr. McIntyre has no personal knowledge." (*Pl's Am. Obj.* at No. 11.) McIntyre's statement is a hypothetical that assumes Defendants believed, based on their professional judgment, that Commissioner Lowe was the appropriate mediator for their other clients. No further information is needed to understand the hypothetical. The objection is **OVERRULED**.

3:22-cv-0437-W-BLM

Case 3:22-cv-00437-W-BLM    Document 110    Filed 12/20/24    PageID.5275    Page 12 of 24

## IV. ANALYSIS

### A. First Cause of Action – Violation of 42 U.S.C. § 1983

The cross motions seek summary adjudication of the first cause of action for violation of 42 U.S.C. § 1983, which is premised on Defendants' alleged violation of Nicholas' Fifth Amendment rights. To prevail on this claim, Nicholas must establish (1) his due process rights were violated and (2) that Defendants were acting under color of state law. *Long v. County of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).[2]

Regarding the state-action prong, "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.'" *DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)). The "determination of whether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity." *Pasadena Republican Club v. Western Justice Center*, 985 F.3d 1161 (9th Cir. 2021) (quoting *Rawson v. Recovery Innovations, Inc.*, 945 F.3d 742, 747 (9th Cir. 2020) (internal citation omitted)). "Courts must engage in 'sifting facts and weighing circumstances' to answer what is 'necessarily a fact-bound inquiry.'" *Id.* (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939

---

[2] Nicholas' motion states that the "Court made multiple determinations of law" that are "now law of the case." (*Pl's P&A* [Doc. 83-1] 1:11–12.) He then appears to suggest that the "under color of state law" issue has been resolved. (*Id.* at 9:15–16, citing Docket 15 and stating: "The 'under color of state law issue' has already largely been litigated in this case"; *see also Pl's Opp'n* [Doc. 103] at 19:25–26, citing Docket 15 and stating: "The Court has already held that Defendants *could* be acting under color of state law."). Any assertion that the Order Denying Defendants' Motion to Dismiss and Strike (the "Order" [Doc. 15]) resolved the under-color-of-state-law issue is incorrect. The Order simply found that under the applicable standard (i.e., assuming the truth of the Complaint's allegations and resolving all reasonable inferences in favor of Nicholas), the Complaint sufficiently alleged Defendants were acting under color of state law. The standard applicable to the current motion is different and requires Nicholas to provide evidence supporting the alleged facts and allows the Court to consider Defendants' evidence. Thus, the previous Order did not establish the law of the case regarding this issue.

Case 3:22-cv-00437-W-BLM    Document 110    Filed 12/20/24    PageID.5276    Page 13 of 24

(1982)). Nevertheless, resolution of the issue on summary judgment is appropriate if there is no evidence supporting joint action.

There are four tests used to identify when a private party has acted under color of state law: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Rawson v. Recovery Innovations, Inc.*, 945 F.3d 742, 747 (9th Cir. 2020). Regardless of the test used, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 747–748.

Here, both parties apply the joint action test. (*Defs' P&A* [Doc. 86-1] 26:9–7; *Pl's Opp'n* [Doc. 89] 20:19–21:25.) This test examines "whether the government has so far insinuated itself into a position of interdependence with a private entity that the private entity must be recognized as a joint participant in the challenged activity." *Pasadena Republican Club*, 985 F.3d at 1167 (quoting *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1210 (9th Cir. 2002)). "A private entity may be considered a state actor 'only if its particular actions are "inextricably intertwined" with those of the government.'" *Id.* (quoting *Burnette*, 294 F.3d at 1211.) "Courts find that individuals act in concert if there is a 'substantial degree of cooperative action' between the state and private actor that results in the deprivation of rights." *Ricotta v. State of California*, 4 F.Supp.2d 961, 984 (S.D. Cal. 1998) (quoting *Collins v. Womancare*, 878 F.2d 1145, 1150 (9th Cir. 1989)).

Generally, § 1983 claims based on joint action between an attorney and judge involve allegations of conspiracies or bribery. For example, in *Dennis v. Sparks*, 449 U.S. 24 (1980), plaintiff filed a § 1983 claim against his adversary in an underlying state-court action. The adversary had bribed the state-court judge in order to obtain an injunction preventing plaintiff from using his oil leases. Eventually, the appellate court dissolved the injunction finding that it was "illegally" issued. In the 1983 case, the district court dismissed the claims reasoning that the private parties could not have acted under color of

state law since the judge was immune from liability. An en banc panel of the Fifth Circuit reversed, and the Supreme Court affirmed explaining:

> Of course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with a judge. But here the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability.

*Id.* at 28.

Nicholas' § 1983 claim is based on an alleged conspiracy between Defendants and Commissioner Lowe to violate his Fifth Amendment due process rights. (*FAC* at ¶¶ 52–58.) This claim is based on Defendants' retention of Commissioner Lowe in the other matters and their failure to disclose those retentions, which Nicholas alleges was done to obtain "favored status" with Commissioner Lowe. (*Pl's Opp'n* [Doc. 103] 20:28–21:1.) This argument is unavailing for several reasons.

To begin, the evidence Nicholas cites fails to demonstrate a conspiracy between Defendants and Commissioner Lowe to violate his Fifth Amendment rights. At best, the evidence establishes Defendants retained Commissioner Lowe to act as a mediator in eight other matters during the Vena case and failed to disclose those retentions. This evidence falls short of suggesting a further agreement for Commissioner Lowe to ignore the law and evidence, and issue rulings in Christine's favor.

Nicholas' theory becomes even more dubious when considered with the other evidence attached to the parties' motions. There is no dispute that Defendants did not unilaterally retain Commissioner Lowe. Instead, she was retained by Defendants and opposing counsel in those cases. Schulman's undisputed testimony is that in the three matters he mediated, opposing counsel—including one who later represented Nicholas[3]—

---

[3] The significance of this fact is that it confirms Schulman's testimony, otherwise the Court expects Nicholas would have provided a declaration from attorney Herbert disputing the statement.

3:22-cv-0437-W-BLM

suggested retaining Commissioner Lowe, not Schulman. There is also no dispute that long before the Vena trial began, Commissioner Lowe notified Nicholas and his attorney that she would entertain offers for additional work and, if accepted, she would not disclose that work. This disclosure is entirely at odds with Nicholas' theory that Commissioner Lowe's subsequent engagements and failure to disclose were part of a secret conspiracy. Finally, there is also no dispute that after Commissioner Lowe recused herself from the Vena case, the orders entered by the Superior Court judges presiding over the case were either worse or no better for Nicholas. This is persuasive evidence that Commissioner Lowe was not biased against Nicholas and there was no conspiracy for her to favor Christine.

Additionally, Nicholas' purported evidence that Commissioner Lowe favored Christine and her counsel is unavailing. His contention is based on the declaration of his attorney Yelman. (*Pl's Opp'n* 20:28–21:1.) The relevant portions of her declaration are entirely conclusory and fail to identify facts supporting her perceptions of Commissioner Lowe. For example, in paragraph 25, Yelman states:

> During various hearings and the child custody trial, I noticed that Commissioner Lowe seemed at times hostile towards our side, and friendly and familiar towards the other side. I have reviewed the declaration of Oscar Roesler on this subject, and I agree with his observation, based on my own experience.

(*Yelman Decl.* [Doc. 103-3] at ¶ 25.) Nowhere in the declaration does Yelman explain why she believed Commissioner Lowe seemed "hostile towards our side." Nor does she identify any hearing or trial transcripts in support of her opinion.

Similarly, in paragraph 28, Yelman contends:

> The child custody trial, in my view, was not a success for my client. The results we obtained were worse than what I hoped or expected. I had no explanation for this at the time. Over the course of the case, Commissioner Lowe continued to make rulings that made no sense to me, that seemed unnecessarily harsh or hostile to my client, and that were unwarranted based on the law and facts. Although I was puzzled and suspicious, I had no concrete basis for making any accusations of wrongdoing.

3:22-cv-0437-W-BLM

(*Yelman Decl.* at ¶ 28.) Again, Yelman fails to explain why she believed Commissioner Lowe was unnecessarily harsh or hostile to her client, or why she believed the rulings were unwarranted based on the law and facts. Even more problematic is the undisputed fact that after Commissioner Lowe recused, the custody and financial support orders issued by the superior court judges were *worse* for Nicholas. This evidence contradicts Yelman's conclusory assertions and confirms that Commissioner Lowe's rulings were not unnecessarily harsh or hostile to Nicholas, nor were they unwarranted based on the law and facts.

Aside from the problems with attorney Yelman's declaration, this Court has reviewed the transcript from child-custody hearing. (*See Defs' NOL*, Ex. 32.) There is nothing in the transcript that supports Yelman's claims regarding Commissioner Lowe.

Finally, Nicholas also points out that joint action may be established by financial interdependence. (*See Pl's Opp'n* at 20:23–24.) As support, Nicholas cites *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961).

In *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), the Supreme Court applied the joint action test to find a privately owned restaurant that discriminated against plaintiff because of his race was acting under color of state law. As support, the Court relied on the fact that the land and building in which the restaurant was located was publicly owned. *Id.* at 723. "[T]he building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions.'" *Id.* In addition, the land, construction and maintenance of the building were defrayed from the City of Wilmington. *Id.* As a result, necessary repairs were the Authority's responsibility, payable from public funds, and the lease agreement required the Authority to supply the restaurant with all decorative finishings and necessary utility connections. *Id.* at 719–20, 724. Particularly important was the "peculiar relationship" of the restaurant to the parking facility in which it was located. According to the Court, the relationship resulted in "an incidental variety of mutual benefits" by providing the restaurant's guests with a convenient place to park and providing the Authority with additional demand for its

3:22-cv-0437-W-BLM

parking facilities. *Id.* at 724. Finally, given the extensive ties between the Authority and restaurant, the Court explained that "[n]either can it be ignored, especially in view of [the restaurant's] affirmative allegation that for it to serve Negroes would injure its business, that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Id.*

Rather than support Nicholas' claim that Defendants were acting under color of state law, *Burton* demonstrates the absurdity of his position. "*Burton* teaches us that 'substantial coordination' and 'significant financial integration' between the private party and government are hallmarks of a symbiotic relationship" that is consistent with joint action. *Pasadena Republican Club*, 985 F.3d at 1168 (citing *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1213 (9th Cir. 2002). Here, there is no indication of coordination or financial integration between Defendants and Commissioner Lowe. Instead, the evidence confirms the existence of contracts for Commissioner Lowe to act as a mediator for Defendants' clients. (*Pl's Am. Opp'n* [Doc. 103] 21:3–5.)  "[M]erely contracting with the government does not transform an otherwise private party into a state actor." *Pasadena Republican Club*, 985 F.3d at 1170 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 840–41 (1982).)

For all these reasons, the Court finds Nicholas has failed to establish Defendants acted under color of state law. Accordingly, Defendants are entitled to summary adjudication of the section 1983 cause of action.

**B.    Second Cause of Action – Negligence**

The cross motions seek summary adjudication of the second cause of action for negligence. To prevail on this claim, Nicholas must establish (1) Defendants owed him a duty, (2) they breached that duty, (3) causation and (4) Nicholas suffered damages. *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal.App.4th 292, 318 (2006)1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). The existence of a duty is a question of law for the court. *Goonewardene v. ADP, LLC*, 6 Cal.5th 817, 837 (2019).

3:22-cv-0437-W-BLM

Defendants seek summary adjudication on the basis that they did not owe Nicholas a duty. (*Defs' P&A* [Doc. 86-1] 8–9.) Nicholas, in turn, contends Defendants owed him a "duty to refrain from extrajudicial actions that would reasonably cause" him harm. (*FAC* at ¶ 64.) In the context of this case, that duty would amount to either the duty to disclose to Nicholas that Defendants had retained Commissioner Lowe on the other cases or a duty to not retain Commissioner Lowe on the other cases during the pendency of the Vena case. For the following reasons, the Court finds under the facts of this case, Defendants did not owe Nicholas a duty.

To begin, Nicholas has not cited a rule or statute that (1) obligated Defendants to disclose to Nicholas that they retained Commissioner Lowe in the other matters or (2) obligated them to not retain Commissioner Lowe in other cases while the Vena matter was pending. In addition, Nicholas' own expert has admitted that Defendants did not owe him a duty. (*Defs' NOL*, Ex. 48 at 433 of 434.)

Nicholas, nevertheless, urges this Court to follow *Rogozienski v. Allen¸* 2007 WL 867773 (4th Dist. March 23, 2007).[4] In *Rogozienski*, the parties in a marriage dissolution proceeding, Shirley and Frank Rogzienski, retained James D. Allen as a temporary judge. Shirley's attorney, S. Michael Love, was also a friend of Allen, and during the dissolution proceeding gifted Allen a time-share in a resort. The gift was not disclosed to Frank. After judgment was rendered, Frank moved to disqualify Allen. The superior court found Allen was disqualified for accepting the gift and granted Frank a new dissolution proceeding. Frank then sued attorney Love for negligence, among other things, contending that "Love had a duty to refrain from extrajudicial actions and conduct that would cause or was reasonably foreseeable to cause him harm." *Id.* at * 3. Frank alleged Love breached this duty when he gave Allen the gift and failed to disclose it, resulting in

---

[4] *Rogozienski* is an unpublished California Court of Appeal opinion. Under California Rule of Court 8.1115, the opinion "shall not be cited or relied on by a court or a party in any other action." *People v. Russo*, 25 Cal. 4th 1124, 1133 n.1. Nicholas contends the case is helpful for evaluating whether Defendants owed him a duty.

3:22-cv-0437-W-BLM

Frank paying attorney's fees in the voided dissolution proceeding. *Id.* at * 6. Love then successfully moved to dismiss arguing he did not owe Frank a duty. The Court of Appeal disagreed and reversed:

> [W]e conclude Love owed a duty of care under the circumstances not to give a gift to Allen when Love was acting as counsel for a party in the dissolution action. Code of Civil Procedure section 170.1, subdivision (a)(6)(iii), states a judge shall be disqualified if "a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." A disqualified judge has no power to act in any proceeding after his or her disqualification (Code of Civ. Proc., § 170.4), and the acts of the judge subject to disqualification are voidable. (Betz v. Pankow (1993) 16 Cal.App.4th 931, 939–940.) It is foreseeable that an attorney for a party giving a nondisclosed gift to a judge during a proceeding would ultimately result in the disqualification of the judge and resulting harm to the parties to the proceeding.
>
> Assuming the truth of the facts asserted, the harm to Frank was certain. The connection between Love's act and Frank's harm is close. The giving of the gift to a judge in a proceeding in which the benefactor is a party or the counsel for a party is morally blameworthy because it brings the judicial system into disrepute. Imposing a duty not to engage in such conduct serves to prevent future such harmful acts. The community will suffer no burden by imposing the duty.

*Id.* at * 7. There are material distinctions between this case and *Rogozienski* that persuade this Court that Defendants did not owe a duty to Nicholas.

Unlike *Rogozienski*, there is no dispute that before the parties retained Commissioner Lowe, she disclosed that she had previously been retained by Defendants, that she would continue to entertain offers from either party and, if retained, she would not disclose the retention. Despite these disclosures, Nicholas raised no objection and agreed to retain Commissioner Lowe. Given these undisputed facts, it ironic that while Nicholas and his counsel essentially acquiesced to Commissioner Lowe's breach of her duty of disclosure, they are now suing Defendants for not protecting them against that breach. Under these facts, the Court finds the degree of blameworthiness attributable to Defendants is significantly less than existed with attorney Love in *Rogozienski*.

3:22-cv-0437-W-BLM

Additionally, the foreseeability that Frank would be damaged by Love's conduct was more certain than the foreseeability that Nicholas would be injured by Defendants' conduct. Unlike Love's gift of the timeshare, Defendants' retention of Commissioner Lowe to act as a mediator in the other matters did not necessarily render her disqualified to continue as the parties' private judge. Instead, Canon 6D(5)(a) required Commissioner Lowe to disclose the retention. Nicholas and his attorney's knowledge that Commissioner Lowe would not disclose subsequent retentions is also relevant in that it placed them on notice about the need to seek additional disclosures if at any time during the proceedings, they had concerns about the Commissioner's conduct. As a result, the foreseeability that Defendants' conduct would lead to Nicholas' harm was more attenuated.

Finally, the Court agrees with Edward McIntyre's view that Defendants owed a duty to their clients in the other matters to retain Commissioner Lowe if they believed she was the best person available. Regarding this issue, there is no dispute that Yelman viewed her as one of only four highly regarded family law mediators. Under these facts, the Court is concerned that imposing a duty on Defendants would place the attorneys in a catch twenty-two.

For all these reasons, the Court finds under the facts of this case, Defendants did not owe a duty to Nicholas and Defendants are entitled to summary adjudication of the negligence cause of action.

### C. Third Cause of Action – Willful Misconduct

Defendants also request summary adjudication of Nicholas' third cause of action for willful misconduct. (*Defs' P&A* at 28:26–29:23.) To prevail on this claim, Nicholas must establish Defendants owed him a duty. *See Simmons v. Southern Pac. Transportation Co.*, 62 Cal.App.3d 341, 360 (1976) (explaining that willful misconduct "is an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care.'") (quoting *Morgan v. Southern Pacific Trans. Co.*, 37 Cal.App.3d

3:22-cv-0437-W-BLM

1006, 1011–1012 (1974)). Because Defendants did not owe Nicholas a duty, the Court will grant Defendants summary adjudication of this cause of action.

### D.    Fourth Cause of Action – Intentional Interference with Contractual Relations

Defendants also request summary adjudication of Nicholas' fourth cause of action for intentional interference with contractual relations.[5] (*Defs' P&A* at 29:24–30:19.) The elements for this claim are: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008) (citation omitted.)

Defendants argue that there is no evidence of an intent to interfere with Nicholas' contract with JAMS and cite the testimony of Westerman and Schulman that they did not intend to interfere with that contract. (*Defs' P&A* at 30:6–9.) Nicholas responds that intent can be inferred from "facts discussed above" and thus summary adjudication is not appropriate. (*Pl's Opp'n* 25:18–19.) The Court is not persuaded by Nicholas' argument for two reasons.

First, Nicholas fails to specify which "facts discussed above" in the opposition demonstrate that Defendants intended to interfere with Nicholas' contract with Commissioner Lowe. As a result, Nicholas is improperly shifting the burden to the Court

---

[5] One essential fact regarding this cause of action is unclear—whether the parties entered separate contracts with Commissioner Lowe (i.e., a contract between Nicholas and Commissioner Lowe and a separate contract between Christine and Commissioner Lowe) or if Nicholas and Christine were parties to the same agreement with Commissioner Lowe. This fact is not clarified in the parties' briefs, and none of the exhibits submitted by the parties identify a contract between Nicholas and Commissioner Lowe. Presumably, the contract Defendants allegedly interfered with is the October 6, 2020 Stipulation between the parties and Commissioner Lowe.

to speculate as to which facts he believes support Defendants alleged intent to interfere with the contract. For this reason alone, the Court finds Nicholas has failed to carry his burden in opposing summary adjudication of this cause of action. *See Friedman v. Live Nation Merchandise, Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (a moving party without the ultimate burden of persuasion at trial may discharge its initial burden on summary judgment by "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.") (citation omitted).

Second, notwithstanding Nicholas' failure to identify evidence of intent, this Court has reviewed Nicholas' motion and opposition and has found no evidence demonstrating an intent to interfere with any contract. For example, in his motion, Nicholas cites evidence that Schulman attended the Vena trial on May 25, when Commissioner Lowe disclosed that she donated to Ms. Feldman's memorial fund but made no mention that she mediated cases on May 3 and 19 with Schulman. (*Pl's P&A* at 5:19–26, citing *Pl's Exhibits*, Ex. 5–22, 18 and 33.) From this fact, Nicholas contends: "Defendants knew that written disclosures to the parties of additional new matters was required" and knew that Commissioner Lowe failed to make such disclosures because "no written disclosure were sent to them and. . . Commissioner Lowe made no disclosures on the record. . . ." (*Id.* at 5:27–6:6.) Assuming for the sake of argument that the evidence supports the inference that Defendants knew Commissioner Lowe failed to make the disclosures to Nicholas, it does not support an inference that Defendants intended to induce Commissioner Lowe to breach her contract with Nicholas, especially when it would have also meant the breach or termination of Christine's contract (whether a separate contract or part of the same contract) with Commissioner Lowe.

Similarly, Nicholas' opposition spends considerable time attempting to establish that Westerman and Schulman: "did know what happened during Westerman's leave; they did talk with other attorneys in the firm about cases; they did know that MSM was retaining Commissioner Lowe in other cases; they did know she had not disclosed the first few new paid matters; and they did know she was likely to continue not disclosing,

3:22-cv-0437-W-BLM

even as MSM offered her more paid business." (*Pl's Opp'n* at 13:13–17.) Again, even if true, these facts do not suggest an intent to interfere with a contract.

For these reasons, the Court finds Defendants are entitled to summary adjudication of the cause of action for intentional interference with contractual relations.

## V.    FED. R. CIV. P. 56(d)

Citing Federal Rule of Civil Procedure 56(d), Nicholas asks the Court to defer ruling on Defendants' motion if "the Court believes more evidence is needed to demonstrate a material dispute concerning the facts presented in Westerman's declaration." (*Pl's Opp'n* at 3:18–20.) The basis for this request is that attorney Yelman was traveling, would not be returning until May and, therefore, did not have access to her files in preparing the declaration is support of Nicholas' opposition. (*Yelman Decl.* ¶ 6.) The Court declines to defer ruling on Defendants' motion for two reasons.

First, "[a] party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).[6] Here, Nicholas fails to specify the facts needed. Instead, he improperly leaves it to the Court to guess whether other facts exist that would allow Nicholas to create a disputed issue of fact with Westerman's declaration. For this reason alone, the Court declines to defer ruling on Defendants' motion.

Second, all citations to Westerman's declaration in this order are for facts that are not material to any issue decided herein, or for facts that are not subject to reasonable dispute. For example, this order cites Westerman's declaration at ¶ 4 for the fact that at

---

[6] Federal Rule of Civil Procedure 56(d) was formerly Rule 56(f). Subdivision (d) of Rule 56 "carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note to the 2010 amendment. "Authorities citing former Rule 56(f) thus offer guidance to interpreting and applying Rule 56(d)." *Mkrtchyan v. Sacrament Cnty*, 2023 WL 6961889 (E.D. Cal. Oct. 20, 2023)

some point "she reduced her workload on the Vena matter in preparation for maternity leave," and that she began "maternity leave in late August." (*See supra* § I.A.) These facts are not material to the issues decided in this order.

The other paragraphs of Westerman's declaration cited in this order simply confirm the entry or substance of orders in the Vena case. For example, this order cites Westerman's declaration at paragraph 3 for the fact that on "March 13, 2020, Judge Wood entered interim custody and visitation orders." (*See supra* § I.) Another example is this order's citation to Westerman's declaration at paragraph 19 for the fact that pursuant to Commissioner Lowe's July 27, 2021 ruling, beginning on July 1, 2021, child support increased to $3,775 per month and temporary spousal support increased to $1,055 for a total of $4830 per month. (*Id.* § I.D.) Because each citation to Westerman's declaration also includes a citation to the Exhibit that contains the relevant order, the citations to her declaration are duplicative. For this additional reason, the Court declines to defer ruling on Defendants' motion.

## VI.    CONCLUSION & ORDER

For these reasons, the Court **DENIES** Plaintiff's motion for summary adjudication [Doc. 83] and **GRANTS** Defendants' summary-judgment motion [Doc. 86].[7]

**IT IS SO ORDERED.**

Dated:  December 20, 2024

---

[7] Nicholas argues summary judgment should be denied as to MSM because Defendants "ignore MSM's liability. . . ." (*Pl's Opp'n* at 15:18–20.) The Court disagrees. Defendants' Notice specifically requests summary judgment on behalf of all Defendants. (*See Defs' Notice* [Doc. 86].) And because the individual Defendants are not liable under the four causes of action, MSM is also not liable.

3:22-cv-0437-W-BLM

## CERTIFICATE OF SERVICE

### *Nicholas Vena v. Moore, Schulman & Moore, APC* et al.

USDC Court Case No.: 3:22-cv-437-W-BLM

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

- **PLAINTIFF'S NOTICE OF APPEAL FROM FINAL JUDGMENT.**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Douglas A. Pettit, Esq.
Caitlin Jones, Esq.
Aaron D. Burden, Esq.
Pettit Kohn Ingrassia Lutz & Dolin PC
11622 El Camino Real, Ste. 300
San Diego, CA 92130
Tel: (858) 755-8500; Fax: (858) 755-8504
E-Mail: dpettit@pettitkohn.com
E-Mail: cjones@pettitkohn.com
E-Mail: aburden@pettitkohn.com
**Attorneys for Defendants**

____ **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Rancho Santa Fe, California in the ordinary course of business. The envelope was sealed and placed for collection and mailing on this date following our ordinary practices. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

____ **(BY ELECTRONIC MAIL)** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

_X_ **(BY ELECTRONIC FILING/SERVICE)** I caused such document(s) to be Electronically Filed and/or Service using the ECF/CM System for filing and transmittal of the above documents to the above-referenced ECF/CM registrants.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct. Executed on January 13, 2025, at Rancho Santa Fe, California.

_____
Kathy Denworth